**POOLE & SHAFFERY, LLP**
David S. Poole (SBN 94690)
  dpoole@pooleshaffery.com
Samuel R.W. Price (SBN 255611)
  sprice@pooleshaffery.com
400 South Hope Street, Suite 1100
Los Angeles, CA 90071
Telephone: (213) 439-5390
Facsimile:  (213) 439-0183

Attorneys for Plaintiff
PHILIPS ELECTRONICS NORTH
AMERICA CORPORATION, a Delaware corporation

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| PHILIPS ELECTRONICS NORTH AMERICA CORPORATION, a Delaware corporation,<br><br>                    Plaintiff,<br><br>    v.<br><br>TRIKARDIA, LLC, a Delaware limited liability company; ROBERT ANTINORO, an individual; and SIDDHARTH BHAVSAR, an individual,<br><br>                    Defendants. | Case No.:<br><br>**COMPLAINT FOR:**<br> **(1) BREACH OF CONTRACT;**<br> **(2) MISAPPROPRIATION OF TRADE SECRET;**<br> **(3) BREACH OF FIDUCIARY DUTY;**<br> **(4) TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY;**<br> **(5) CONVERSION; AND**<br> **(6) UNFAIR BUSINESS PRACTICES UNDER CAL. BUS. & PROF. CODE §§ 17200 ET SEQ.**<br><br>[*28 U.S.C. §§ 1332, 1391*] |

///

///

///

1
**COMPLAINT**

## PARTIES

1. Plaintiff Philips Electronics North America Corporation ("Philips") is a Delaware corporation having its principal place of business in Andover, Massachusetts. Philips Healthcare is a division of Philips.

2. Defendant TriKardia, LLC ("TriKardia") is a limited liability company formed under the laws of the State of Delaware. TriKardia has offices and conducts business in Newbury Park, California and in this Judicial District. Upon information and belief, members of TriKardia are Defendant Robert Antinoro ("Antinoro"), Kenneth A. Richards ("Richards"), and/or Leigh Wells ("Wells"). Upon information and belief, all members of TriKardia are citizens of Canada, or the states of California and Connecticut. Upon information and belief, no member of TriKardia is a citizen of Massachusetts or Delaware.

3. Antinoro is an individual and a resident of the State of California.

4. Defendant Siddharth Bhavsar ("Bhavsar") is an individual and a resident of the State of California.

## JURISDICTION AND VENUE

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 based on diversity of citizenship. The amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391. Defendants reside in this Judicial District and a substantial part of the events or omissions giving rise to Philips' claims occurred in this Judicial District.

## GENERAL ALLEGATIONS

7. Philips manufactures, sells, and services electrocardiogram ("ECG") systems, including the hardware and software necessary to operate and repair the systems. Generally speaking, an ECG is a test that checks for problems with the electrical activity of a patient's heart.

8. One ECG management system that is manufactured and sold by Philips is its IntelliSpace ECG Management System, which was previously known as the TraceMaster management system and the TraceMasterVue management system (hereinafter, "IntelliSpace ECG"). IntelliSpace ECG is an advanced data management system that automates the processing, storage and distribution of ECG, Holter (*i.e.*, a portable device used to monitor electrical activity of the cardiovascular system), and stress data acquired from multiple sources. IntelliSpace ECG provides the software tools to analyze, view, edit, and compare ECG records, as well as to generate, manage, and distribute reports in various formats.

9. Philips invested years of research and development and dedicated substantial funds and other resources to develop the ECG management system to the place it is today. Philips' IntelliSpace ECG system has evolved since the mid-1970's to the full-featured, reliable, and scalable system it is today. Various features of the IntelliSpace ECG are very complex and took years to develop. Examples of this include the scalability, single sign-on, and active directory integration features.

10. Defendant Antinoro was formerly employed by Philips. Antinoro began working for Philips in 2000 as a Manager of Software Engineering having previously worked at Zymed Laboratories, Inc. in a similar capacity, a company which Philips acquired in 2000.

11. In 2001, Antinoro became Philips' Senior Manager, Software Systems Engineering. On or about that time, Antinoro signed an Employee Ethics and Intellectual Property Agreement, as well as an Employee Invention Attachment. Among other things, Antinoro agreed not to use, publish, or otherwise disclose secret or confidential (proprietary) information of Philips, and to (with limited exceptions not applicable here) assign to Philips inventions and technical or business innovations developed or conceived while Antinoro was employed by Philips.

12. Defendant Bhavsar was formerly employed by Philips as a software engineer.

13. Both Antinoro and Bhavsar worked on the IntelliSpace ECG system for Philips in Philips' facility in Thousand Oaks, California, with Antinoro acting as the "head" of engineering for IntelliSpace ECG.

14. In their respective roles at Philips, Antinoro and Bhavsar had access to certain Philips' trade secrets and confidential and proprietary information. Philips' trade secrets and confidential and proprietary information within their access specifically included, but was not limited to, computer source code for Philips' IntelliSpace ECG system.

15. While working for Philips as Senior Manager, Software Systems Engineering and head of engineering for the IntelliSpace ECG system, Antinoro was repeatedly approached by Philips' personnel recommending and asking that Antinoro pursue and develop on behalf of Philips a web-based interface for the IntelliSpace ECG system. Antinoro refused to do so for Philips, impeded Philips' pursuit of a web-based solution for IntelliSpace ECG, and discouraged adding other features to IntelliSpace ECG.

16. Unbeknownst to Philips, at the same time and during Antinoro's employment by Philips, Antinoro was utilizing Philips' facilities, supplies, computers, know-how, equipment and resources to develop a web-based interface to compete with Philips and its IntelliSpace ECG system.

17. In approximately 2012, Philips announced it would be closing its Thousand Oaks, California facility because it would be relocating its IntelliSpace ECG product line to facilities in China. The closure of the Thousand Oaks facility resulted in a reduction in force. Many Philips' employees who had been working on IntelliSpace ECG in Philips' Thousand Oaks, California facility would discontinue their employment with Philips. Philips advised Antinoro and Bhavsar they ultimately would be included in the reduction in force.

18. While still employed by Philips as its Senior Manager, Software Systems Engineering, Antinoro began working with others to set up a business (TriKardia) to compete with Philips and its IntelliSpace ECG product.

19. To establish the competing business, Antinoro worked with Leigh Wells, a former Philips employee who had previously worked on the IntelliSpace ECG system and who was affiliated with a Canadian software development company called Phase 3 Development, Bhavsar, and Kenneth Richards who previously worked for Philips as its Senior Global Product Manager.

20. Emails later recovered from Antinoro's Philips computer (and sent from Antinoro's Philips email account) demonstrate that at least by February 20, 2012, Antinoro, Wells and Bhavsar were working on a competing ECG management system, "CardioCenter," and editing source code for the CardioCenter software. CardioCenter is a web-based ECG Management System that is sold today by TriKardia and that directly competes with Philips' IntelliSpace ECG system. Antinoro and Bhavsar continued to work on the competing CardioCenter system throughout the remainder of their employment by Philips.

21. Upon information and belief, CardioCenter is TriKardia's sole product. On its website, TriKardia promotes CardioCenter as "Truly Web Based to ensure access from almost anywhere, anytime, via any web enabled client."

22. Antinoro and Bhavsar, while working for and being paid by Philips, used Philips' facilities, equipment, supplies and resources, and accessed, took and used confidential and proprietary Philips information related to Philips' IntelliSpace ECG system, to develop and/or substantially accelerate the development of CardioCenter.

23. The CardioCenter system, and the technology underlying and contained within it, at the time of its conception or reduction to practice, related to the business of Philips, related to Philips' actual or demonstrably anticipated research or

development, and resulted from work performed, or that should have been performed for Philips.

24. Philips is the owner of numerous copyrights, trade secrets and intellectual property rights relating to its IntelliSpace ECG system, including rights to the confidential and proprietary source code of the IntelliSpace ECG system.

25. Philips' has gone to significant effort and expense to develop and maintain its copyrighted works, trade secrets, and confidential and proprietary information relating to its IntelliSpace ECG system.

26. Philips confidential and proprietary information relating to its IntelliSpace ECG system, including, but not limited to its source code, are not known or generally ascertainable by Philips' competitors or others outside Philips, and has independent economic value. Philips' competitors or others outside Philips could obtain economic value from the confidential and proprietary information relating to the IntelliSpace ECG system if they were able to access it.

27. Antinoro and Bhavsar knew that the Philips' information relating to the IntelliSpace ECG system that they took, used and/or misappropriated on behalf of themselves and/or TriKardia was confidential and proprietary information owned by Philips. Antinoro and Bhavsar knew that they owed obligations to Philips not to use or to disclose confidential and proprietary Philips information.

28. Upon information and belief, Antinoro took deliberate steps to evade Philips' detection of the files and information that Antinoro was taking from Philips to use on behalf of himself and/or TriKardia.

29. Information that Philips has been able to recover to date, however, shows that on May 25, 2012, Antinoro sent himself via email three Philips' computer source codes for Philips' ECG filtering algorithms, including a high pass filter, a low pass filter and a waveform filter. Antinoro sent himself these confidential and proprietary computer source codes from his Philips email account to his personal Gmail account.

30. Philips and its employees authored and Philips owns the confidential and proprietary source codes. In addition, Antinoro sent from his Philips' email to his personal Gmail account screenshots of Philips' ECG filter settings.

31. Upon information and belief, on or about July 13, 2012, and while employed by Philips, Antinoro purchased and registered TriKardia's web domains, TriKardia.com and TriKardia.net.

32. On or about December 10, 2012, TriKardia was formed under the laws of the State of Delaware. Upon information and belief, while still employed by Philips, Antinoro caused or directed TriKardia's formation.

33. On December 28, 2012, Bhavsar executed a Settlement and General Release Agreement with Philips. Under his Settlement and General Release Agreement, Bhavsar's employment with Philips terminated effective January 2, 2013. Pursuant to the Settlement and General Release Agreement, Bhavsar received a lump sum severance payment of $35,054.22.

34. Antinoro's employment with Philips terminated effective February 28, 2013. On March 5, 2013, Antinoro executed a Settlement and General Release Agreement with Philips. Under his Settlement and General Release Agreement, Antinoro received a lump sum severance payment of $118,095.11.

35. In each of their respective Settlement and General Release Agreements, Antinoro and Bhavsar agreed as follows:

> You agree that all information contained or possessed by you relative to the activities of the Philips Group [defined to include Philips "and its affiliated companies"] which is of a secret or confidential nature, which may include but is not limited to customers' lists, pricing, and technical and production know-how, developments, inventions, processes, or administrative procedures, is the property of the Philips Group or its licensors, as the case may be, and you shall not during the term of this agreement or thereafter, use for the benefit of others or

disclose to others such information so long as its secret or confidential nature be preserved by the Philips Group; nothing herein shall prevent you from using and availing yourself of your general technical, engineering and inventive skill, knowledge and experience, including that pertaining to or derived from the non-secret and non-confidential aspects of the activities of the Philips Group.

36. In each of their respective Settlement and General Release Agreements, Antinoro and Bhavsar also agreed to return to Philips all of Philips' property in their possession

37. TriKardia released and began selling its CardioCenter software shortly following the termination of Antinoro's employment with Philips. On his LinkedIn account, Antinoro represents he is TriKardia's Director of Software and Product Development. Antinoro further represents that he began serving in his TriKardia role in 2012, despite the fact that his employment by Philips did not terminate until 2013. Wells is acting today as TriKardia's Director of Technology.

38. TriKardia's CardioCenter product is strikingly similar to Philips' IntelliSpace ECG system. The striking similarity in features between IntelliSpace ECG and CardioCenter includes, but is not limited to: (a) identical ECG modalities; (b) markedly similar resting ECG editing; (c) markedly similar multi-modality PDF reports editing; (d) markedly similar ECG location hierarchy (prior to CardioCenter, IntelliSpace ECG was the only ECG management system with three level hierarchy); (e) scalability (prior to CardioCenter, IntelliSpace ECG, through years of engineering effort, was uniquely accessible to every size of facility solving an important affordability issue); (f) active directory integration (which is difficult to implement and required years of engineering efforts by Philips); and (g) single sign-on (another difficult to implement feature requiring significant engineering effort by Philips).

39. On TriKardia's website, www.trikardia.com, TriKardia advertised two features for CardioCenter that would require a license from Philips to operate as it was marketed by TriKardia.

40. First, TriKardia advertised resting ECG acquisition device support of Philips' products that could not operate (*i.e.*, natively accept ECG's from Philips) unless TriKardia was using Philips' proprietary communication protocol, consisting of multiple XML XSD schema files.

41. Second, TriKardia offered an ECG orders download cart for Philips products. The CardioCenter feature could not operate (*i.e.*, support bi-directional communication with Philips cardiographs) unless CardioCenter was using Philips' proprietary communication protocol.

42. Philips wrote to Antinoro and TriKardia in August 2014 and demanded that Antinoro and TriKardia: (1) immediately cease and desist from the improper and illegal distribution of CardioCenter or any substantially similar products that unlawfully utilize Philips' intellectual property; (2) immediately return all of Philips' intellectual property in Antinoro's and/or TriKardia's possession, including any copies; (3) immediately take action to preserve information related to these matters; and (4) provide written assurance to Philips that Antinoro and TriKardia would comply with Philips' demands.

43. Antinoro and TriKardia have refused to cease and desist as demanded by Philips, and have continued to willfully disregard and violate Philips' intellectual property rights.

44. In a letter from Antinoro's counsel dated September 19, 2014, Antinoro (and purportedly TriKardia) represented to Philips that TriKardia agreed to remove certain Philips-related statements from TriKardia's website and "to ensure that the CardioCenter product does not natively support the Philips communication protocol … until such time that it has a valid license to use the same," effectively admitting

that TriKardia had been using Philips' proprietary communication protocol without a license to do so.

45. Antinoro otherwise denied Philips' demands, admitted that CardioCenter was "a product that was in development long before Mr. Antinoro left Philips," and falsely claimed that the similarities between its features and those of IntelliSpace ECG were "not based on any misappropriation of trade secrets, but instead on TriKardia's extensive research and analysis of competitive products in the marketplace."

46. In the same letter from his lawyer, Antinoro also sought to obscure Antinoro's central role in the formation of TriKardia to compete with Philips, characterizing TriKardia as a "company that was founded by others prior to Mr. Antinoro's departure from Philips."

## FIRST CLAIM FOR RELIEF
## BREACH OF CONTRACT
### (Against Antinoro and Bhavsar)

47. Philips realleges and incorporates by this reference all paragraphs above as if fully set forth herein.

48. The Employee Ethics and Intellectual Property Agreement and Employee Invention Attachment, and Settlement and General Release Agreement executed by Antinoro are valid and enforceable contracts.

49. Antinoro breached the Employee Ethics and Intellectual Property Agreement and Employee Invention Attachment by engaging in wrongful acts, including, but not limited to (a) sending to a private email account source code information that is a Philips trade secret; (b) sending to a private email account Philips' ECG filter information that is a Philips trade secret; (c) failing to return property of Philips upon termination of his employment, including, but not limited to, source code and filter information; (d) using, publishing and disclosing confidential and proprietary information of Philips during and after his employment

with Philips ceased; (e) failing to disclose, assign, or provide to Philips innovations conceived during Antinoro's employment, and failing to provide to Philips a web-based solution for the Philips product which he then provided to TriKardia; and (f) failing to perform all reasonable acts and otherwise provide proper assistance to Philips to enable Philips to obtain legal protection for such innovations or inventions.

50. Antinoro breached the Settlement and General Release Agreement by engaging in wrongful acts, including, but not limited to (a) using for himself and/or the benefit of others and disclosing Philips' secret and confidential information; (b) accepting $118,095.11 under false pretenses because, among other things, he knew he was in violation of his Employee Ethics and Intellectual Property Agreement, and was using for himself and/or others and disclosing Philips' confidential and proprietary information both before and after signing; and (c) failing to return all Philips' property, including but not limited to the source code, the filter setting screen shots, and other information.

51. The Settlement and General Release Agreement executed by Bhavsar is a valid and enforceable contract.

52. Bhavsar breached the Settlement and General Release Agreement by engaging in wrongful acts, including but not limited to (a) failing to return all Philips property; (b) using and/or disclosing Philips' information of a secret and confidential nature; and (c) accepting $35,054.22 under false pretenses because, among other things, using and/or disclosing Philips' confidential and proprietary information both before and after signing.

53. Antinoro's and Bhavsar's actions as described herein are breaches of their contractual obligations to Philips.

54. Philips has been damaged as a direct and proximate result of Antinoro's and Bhavsar's breaches of contract in an amount to be proven at trial, and is entitled

to judgment against Antinoro and Bhavsar for its damages, and its costs of litigation. These damages exceed hundreds of thousands of dollars.

55. Under the Employee Ethics and Intellectual Property Agreement and Employee Invention Attachment, Philips is also entitled to an assignment, without further compensation, of all those inventions and technical or business innovations related to CardioCenter that were developed or conceived by Antinoro alone or with others during Antinoro's employment by Philips.

## SECOND CLAIM FOR RELIEF
## MISAPPROPRIATION OF TRADE SECRETS
### (Against All Defendants)

56. Philips realleges and incorporates by this reference all paragraphs above as if fully set forth herein.

57. Defendants owe Philips a statutory and common law duty to not obtain through improper means, disclose and/or use Philips' trade secrets.

58. Philips' trade secrets and confidential information include, but are not limited to, Philips' computer source code, filter information, algorithms and other materials and data which constitute trade secrets under Cal. Civ. Code § 3426.1(d). These materials, data and information which are confidential and proprietary have economic value because they are generally not known or readily ascertainable by proper means within the trade. These trade secrets were the subject of efforts of Philips to protect them from disclosure and/or use by others.

59. TriKardia and its principals knew or should have known that Antinoro and/or Bhavsar were acquiring Philips' trade secrets through improper means and unlawfully disclosing Philips' trade secrets in violation of Antinoro's and Bhavsar's contractual, common law, and statutory duties.

60. Defendants knowingly misappropriated Philips' trade secrets and/or confidential information without Philips' implied or actual consent with knowledge that unlawful means were used to acquire the trade secrets and that they were

acquired by persons owing duties to Philips to maintain their secrecy and to limit their use.

61. Defendants' misappropriation, use and disclosure of Philips' trade secrets has been willful and malicious, is in violation of the California Uniform Trade Secrets Act, and Defendants acted with intent to injure Philips and have damaged Philips in an amount to be proven at trial.

62. Philips is entitled to judgment for its actual losses, the unjust enrichment caused by the Defendants' misappropriation, double damages based upon Defendants' willful and malicious acts of misappropriation, and attorneys' fees and costs. Philips' damages exceed hundreds of thousands of dollars.

63. Philips is entitled to an injunction restraining the use of, or disclosure by Defendants of Philips' trade secrets and fruits thereof pursuant to Cal. Civ. Code § 3426.2.

## THIRD CLAIM FOR RELIEF
## BREACH OF FIDUCIARY DUTY
### (Against Antinoro)

64. Philips realleges and incorporates by this reference all paragraphs above as if fully set forth herein.

65. As Philips' Senior Manager, Software Systems Engineering, Antinoro had a fiduciary relationship with Philips. Philips entrusted Antinoro to head up its engineering team for the IntelliSpace ECG product line and placed trust and confidence in Antinoro to act with loyalty to Philips. Antinoro voluntarily accepted Philips' trust and confidence.

66. While still employed, Antinoro worked to create and further the interests of a direct competitor and to develop the directly-competing CardioCenter system, while refusing to develop or pursue a web-based solution and other advancements for the IntelliSpace ECG system.

67. Antinoro worked to impede and frustrate Philips' efforts and recommendations to pursue improvements for the IntelliSpace ECG system, including a web-based interface.

68. Antinoro's actions as described herein were taken knowingly, intentionally and maliciously, and breached Antinoro's fiduciary duties and duty of loyalty owed to Philips.

69. Philips has been harmed by Antinoro's breaches of his duty of loyalty and, as a direct and proximate result of those breaches of fiduciary duty, Philips' advancement and improvement of IntelliSpace ECG system have been delayed and/or impeded to Philips' detriment.

70. Philips has been damaged by Antinoro's breaches of fiduciary duty in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
### (Against Antinoro and TriKardia)

71. Philips realleges and incorporates by this reference all paragraphs above as if fully set forth herein.

72. As a result of substantial efforts and considerable amounts of time, money, and energy expended by Philips to develop its IntelliSpace ECG system, its customer base and marketing strategies, Philips has prospective business advantages, opportunities and/or expectancies, and contracts with customers.

73. Philips uses its trade secrets and other confidential and/or proprietary information to attract new business from existing customers as well as from prospective customers.

74. As a result of his past employment relationship with Philips, Defendant Antinoro was and is aware of Philips' business advantages, opportunities and/or expectancies, and/or contracts.

75. Defendants intentionally, improperly and unlawfully interfered with Philips' business advantages, opportunities and/or expectancies in its industry with actual and prospective customers and/or others who, as a result of the wrongful acts described above, may refuse to do business with Philips.

76. As a direct and proximate result of Defendants' wrongful, improper and intentional interference with Philips' prospective business advantage, opportunity, and/or expectancy and contracts, Philips has suffered immediate and irreparable harm and injury including, but not limited to, potential substantial losses in revenues, loss of profits, loss of goodwill, loss of business relations with existing and future business prospects, loss of competitive business advantage, opportunity and/or expectancy.

77. There is substantial risk that Defendants will continue to tortiously interfere with Philips' prospective business advantage, opportunity and/or expectancy and/or contracts with its customers unless Defendants are temporarily restrained and/or preliminarily and/or permanently enjoined.

78. Philips has no adequate remedy at law.

79. Defendants' conduct was and is fraudulent, malicious, oppressive, and in willful disregard of Philips' rights. As a result, the imposition of exemplary or punitive damages against Defendants is warranted.

## FIFTH CLAIM FOR RELIEF

### CONVERSION

### (Against Antinoro)

80. Philips realleges and incorporates by this reference all paragraphs above as if fully set forth herein.

81. Philips is the exclusive owner of information and property and is legally entitled to its possession. Philips is legally entitled to exclusive enjoyment of the benefits derived from its property.

82. In his Employee Ethics and Intellectual Property Agreement, Antinoro agreed that at the conclusion of his employment he would return any of Philips' written or other materials.

83. In his Severance Agreement and General Release, Antinoro agreed to return all property of Philips and not to use Philips' property for the benefit of others, or to disclose to others such confidential information.

84. Antinoro converted Philips' property to his own use and benefit by improperly retaining it and using it following his employment with Philips.

85. Upon information and belief, Defendants Antinoro and TriKardia are now using such property in competition against Philips.

86. The value of Philips' property converted by Antinoro is a sum to be determined at trial, but exceeds hundreds of thousands of dollars.

87. As a direct and proximate result of this wrongful conversion, Philips sustained and continues to sustain immediate and irreparable harm and injury including, but not limited to, loss in revenues, loss of profits, loss of goodwill, loss of business relations with existing and future business prospects, and loss of competitive business advantage, opportunity and/or expectancy.

88. Philips has no adequate remedy at law and there is a substantial risk that Defendants will continue to irreparably injure Philips unless Defendants are temporarily restrained and/or preliminarily and/or permanently enjoined.

89. In the alternative, and/or in addition to the irreparable injury described above, as a direct and proximate result of the conduct described above, Philips has suffered actual and/or consequential damages, and is entitled to recover these damages from Defendants.

90. The acts described above were performed intentionally and with improper motives. Moreover, for the reasons stated above, such actions were oppressive, outrageous, willful, malicious, intolerable and performed with a reckless

disregard for their possible results, and/or performed with an evil mind so as to justify an award of punitive damages.

## SIXTH CLAIM FOR RELIEF

## UNFAIR BUSINESS PRACTICES UNDER CAL. BUS. & PROF. CODE § 17200 ET SEQ.

### (Against All Defendants)

91. Philips realleges and incorporates by this reference all paragraphs above as if fully set forth herein.

92. By engaging in the conduct and practices alleged above, Defendants have committed and continue to commit acts of unfair competition in violation of California Business & Professions Code Section 17200, *et seq.* ("Section 17200").

93. Defendants' improper actions extend beyond the misappropriation of trade secrets and independently violate Section 17200, including, but not limited to, by:

(a) taking Philips' property for their own personal use;

(b) using Philips' resources to facilitate actual and planned competition by TriKardia;

(c) procuring severance payments by improper means; and

(d) pursuing their own interests while still employed and paid by Philips, all while concealing their actions from Philips through deception and omissions.

94. Philips has no adequate remedy at law and will be irreparably harmed in its business absent provisional and permanent injunctive relief to prevent Defendants' continuing violations of Section 17200.

95. By virtue of their past and continuing violations of Section 17200, Defendants have unfairly and unlawfully misappropriated revenue and profit that Philips would have earned but for Defendants' conduct. Philips is entitled to restitution from Defendants in the amount according to proof.

## **PRAYER FOR RELIEF**

Wherefore, Philips prays for judgment against Defendants, jointly and severally, as follows:

1. For judgment in an amount to be proven at trial;

2. For double, exemplary, or punitive damages to the fullest extent permitted by law;

3. For specific performance and an assignment, without compensation, of all those inventions and technical or business innovations related to CardioCenter that were developed or conceived by Antinoro alone or with others during Antinoro's employment by Philips;

4. For prejudgment interest to the fullest extent permitted by law;

5. For attorneys' fees, costs and disbursements herein;

6. For restitution and disgorgement of monies acquired by means of the acts alleged above;

7. For a preliminary and permanent injunction enjoining and restraining Defendants and their respective officers, agents, servants, employees, attorneys and others in active concert or participation with them from (1) misappropriating Philips' trade secrets; (2) engaging in acts that tortiously interfere with Philips' prospective business advantage, opportunity and/or expectancy and/or contracts; (3) engaging in acts that are a further material breach of any contract between Defendants and Philips; (4) engaging in acts that constitute a conversion of Philips' property, trade secrets, or other confidential and proprietary information; and (5) directly or indirectly utilizing, converting or otherwise disclosing Philips' trade secrets, confidential and/or proprietary information, and/or other property; and

8. For such other and further relief as the Court deems just and proper.

DATED: May ____, 2015          **POOLE & SHAFFERY, LLP**

By: _____
    David S. Poole
    Samuel R.W. Price
Attorneys for Plaintiff
PHILIPS ELECTRONICS NORTH AMERICA CORPORATION

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38-1, Plaintiff PHILIPS ELECTRONICS NORTH AMERICA CORPORATION hereby demands trial by jury in this action for all claims and issue so triable.

DATED: May ____, 2015          **POOLE & SHAFFERY, LLP**

By: _____
    David S. Poole
    Samuel R.W. Price
Attorneys for Plaintiff
PHILIPS ELECTRONICS NORTH AMERICA CORPORATION